Now we move from housing to fish, and our next case is Crawfish Processors Alliance at Alvarez v. United States, 06-1501, Mr. Steinberger. Thank you, good morning. This is a Chenery case. That is a fish case. I'm sorry? That is a fish case. It's a crawfish case, but that opens the philosophical question of what is a fish. Commerce based its final scope determination on the existence of a transformation. That was the basis of their decision. Judge Wallach at the CIT based his decision on a conclusion about essential character, a different kind of test from what Commerce employed. Judge Wallach understood that essential character was really what this case should be about, but unfortunately misapplied the concept. So as I said, it's a Chenery case, SEC v. Chenery, and the agency should not be upheld on grounds that differ from the grounds announced by the agency. So what happened to Commerce? Commerce was confronted with an order that covered freshwater crawfish tail meat in all its forms, regardless of how it is preserved and prepared. Of course, all of our arguments go to the issue of what does that mean, preserved and prepared? But the order said regardless. Regardless of how they're preserved or prepared. So what difference does preserved or prepared make if it's regardless? Well, because the product at issue, which was crawfish etouffee, was in our judgment a form of prepared and preserved crawfish tail meat. Didn't the agency find that it had undergone a substantial transformation? Isn't that a fact? I'm sorry. Isn't that a fact? The agency didn't use the phrase substantial. They used the phrase transformed, I believe, in the operative language. Similarly, the department finds that crawfish tail meat, et cetera, has also undergone a substantial transformation. I'm sorry. This is under the diversified product analysis. Oh, I'm sorry. I was looking at page 825, but in any event, it doesn't matter. The test that they applied related to the extent to which the product was transformed in the course of becoming etouffee. And our issue with that was that you start by looking at the language of the order. And there's no disagreement that that's where you begin. Commerce agrees that that's where you begin. Under their regulation, first you go to the order and the record of the original investigation and anything that has come before, administrative reviews, scope cases, there were none in this case. And if you can make a determination that the product is within the scope on that basis, then you're done. You never go on to diversified products. You are done. They should have stopped there because this product is preserved or prepared or both, crawfish tail meat. They did not stop there because commerce misunderstood what preserved and prepared mean, despite being presented with decades of cases about what those terms mean. We took the cases from the CIT and they were, I believe, all of them classification decisions. Why did we use classification decisions in a dumping scope case? Well, because there are not a lot of dumping scope cases out there about crawfish tail meat or the context of preserved and prepared in that particular context. But there are a lot of cases on customs classification. This is the type of case where the issue is how you classify goods coming in, what those terms mean. So we weren't saying it's classified in such a way under the tariff schedule and therefore you should find that it's either in scope or out. Those cases are about what people mean when they say preserved or prepared. When the CIT does classification decisions, that's really what it's doing. What is the ordinary meaning? Commerce seems to be saying these flavors, the different flour, cooking oil, onions, bell peppers, tomatoes, seasonings, blah, blah, blah. It's going to permeate the fish. You can never extract it from the fish again. You can never recover fish. It's not a preservative in the sense of preserving the product. It has changed the product. Exactly. And how do you get the salt back out of the stew? And so commerce seems to have a pretty good basis, in fact, for its determination that this is no longer crawfish, per se. It's something different. Well, I'm not challenging the fact quite so much. I'd like to later, but for present purposes, let's say they're correct. I think it's incumbent then on commerce to explain why. In other cases where preserved and prepared are terms that the CIT has interpreted, such changes were not relevant. You can take garlic, pulverize it, wash it with alcohol, come up with a solution, mix it with soybean powder. It doesn't even smell anymore, and yet still you have prepared garlic. You can take potatoes, grind them up, dry them. You still have prepared potatoes. So we go through all those cases. Why, when you do lesser things to crawfish, do you not still have prepared crawfish? Well, these are obviously spread out over a spectrum, and you have to decide at some point it ceases to be product one and it becomes product two. Would you say, for example, that if the order covered crawfish tails and the product in question was crawfish gumbo, that it would be covered? Well, maybe, but I think you're exactly right that you're dealing with a spectrum. Or if the product is wheat that's covered by the dumping order, would you say that bread is just prepared wheat? That is exactly the type of problem that commerce was facing. Right, and commerce, that's the kind of problem as to which commerce seems to me gets a great deal of breadth of discretion to make those kinds of judgments. Which discretion is respected by the CIT? And we're just reviewing at the second level the CIT's determination as to the question of the exercise of discretion. It's hard for me to see how we're going to sweep in and say, well, we know crawfish better than commerce or the CIT, and we think that etouffee is really essentially crawfish tails, even though gumbo would not be. I appreciate that. Yes, commerce has discretion, but their discretion is limited, and this court has previously said you can't read language out of the scope description. Well, if it said etouffee, I would agree with you. We would have a legal issue as to which I suspect there'd be no way for you to lose. You wouldn't have lost in the CIT, but it doesn't. So there's clearly an open question here, it seems to me. I don't see why that's not a question which commerce is entitled to answer either way. Had it said one way, had it ruled in your favor? Any effort on the part of coastal to come to us might have had just as difficult a time. The problem with commerce's decision is that it is completely at odds with the meanings of these terms. And you're right, it is a spectrum question. The question is that there's a door at one end of the spectrum, there's a door at the other end. Why is it completely different? I think that's what we were just discussing with Judge Bryson. You've changed this product into something quite different. Why aren't they entitled to find it's a gumbo or a soup or something rather than a tail? Your Honor, when you said you've changed it into something quite different, what you've really done is conflate two concepts. You've changed it is the first one. Into something quite different is the second one. Commerce decided a change has occurred, so we are not going to listen to you folks anymore. But isn't it their call whether that change is the wheat bread character or just putting ice on crawfish tails? But all they said was a change has occurred, first of all. Well they said it's transformed into a different product, which is both elements of what you just identified. Into a different product. But they said because a change has occurred, because there has been a change, it cannot be prepared or preserved. In fact, in order to be prepared or preserved, as the CIT cases indicate, there has to be a change. So you can't consistently with the express terms of the scope, rule out the possibility of the change. Commerce, after saying there is a change, should have gone on to say, is this still a product within the scope or out of the scope? The CIT tried to get at that by talking about essential character, because the lower boundary of the spectrum, when the CIT has looked at it, and we didn't get to cite these cases below because we never got the chance, there is a lower boundary to this when the product loses its character as tomatoes or garlic or mushrooms or whatever,  If I need etouffee for my banquet tomorrow night, am I going to go buy a crawfish? It depends. Are you a good cook? Well, it's interesting though that they're different, aren't they? It seems to me that if I want etouffee, I'm going to buy etouffee, right? I'm not going to buy crawfish unless I am a good chef, as you say, in which case I'm going to do an awful lot with bell peppers and flour and marination and whatever else has to happen. It's actually quite easy to make etouffee, but that's not on the record. I don't want to get too far off on the tangent. I didn't know that my colleague was having a banquet. You're well into your rebuttal, would you like to save it or use it? I would like to save it, please. Okay, we will save it. Mr. Silverberg. Good morning, Your Honors. May I please the court? There is no chain rate problem here. However, even if there were, this court reviews de novo, so chain rate would not be an issue. The chain rate problem is with respect to the agency and the reviewing court, right? In other words, if the agency is saying X, then we can't review the agency on any basis other than what the agency has chosen, right? That's correct. However, here, as I understand Helen's argument, they're saying that the trial court, which I disagree with, reviewed on the wrong basis. Oh, I see what you're saying. This court's review is de novo, so that's irrelevant. Why is our review de novo? What's the basis for that? This court has consistently held that it reviews de novo. Are you going all the way back to the Atlantic Sugar case? Is that what you're talking about? I believe the statutory basis for this court's review... No, no, the statute talks about the Court of International Trade. It doesn't give a standard of review for this court. This court has read into that statute, which governs very clearly only the Court of International Trade, that we should do something, we should repeat the entire review of the record that the CIT has already done. Does that make any sense as a matter of judicial economy as well as just appellate procedure? Your Honor, this court, although it has consistently held that it reviews de novo, it has also said that it does respect the decisions of the court before and looks to them for guidance. We've said that, but you just told us our law says de novo. Yes, Your Honor. And I'm asking, does that make any sense? I know that this has been discussed in a few cases, and the court has in the past contemplated the difficulties of this, but I'm wondering if the government has given thought to it. I believe it does make sense, Your Honor, in this administrative context, because it is based upon administrative review. However, this court does not review de novo factual findings of the court below. It doesn't review de novo findings of contempt of the court below. There are many instances where this court reviews the trade court's decisions, granting the trade court substantial deference. However, let me ask you a more direct question. If this court wished to reconsider its standard of review in dumping cases, would the government want to respond? Absolutely. You'd want to have a chance to brief and comment? Certainly, Your Honor. I believe that would have to be taken at the en banc level. I think it would have to be en banc. I agree with you there, but you'd want to be involved in that. Certainly. Of course, if you were to urge deferential review, I suppose that would put the Chenry argument back in play, wouldn't it? It possibly could. In this case, Your Honor, however, I do not believe that the trial court affirmed on a different basis than commerce held in this case. You think essential character and transformed into different product are the same inquiry? Well, the trial court held that the transformation in this case had gone beyond or the change to the essential character had gone beyond what would be prepared. Therefore, it is essentially the same substantial transformation. But the standard of review is relevant to this case, isn't it? Because it does potentially put in play a different set of circumstances, a potential Chenry problem. Your response to why there isn't a Chenry problem is standard of review. If the standard of review were to be changed by this court en banc, Chenry would be back in play, potentially. Yes, but I disagree that it would apply to this case, Your Honor. You think you win even with Chenry? You win even under Chenry. Regardless of Chenry, we would prevail in this case. But the standard of review is relevant to this case. It is because the court can look at it. If this court decides to take this case en banc to reconsider its standard of review, it has a justiciable issue. Certainly, Your Honor, it would be a question of whether... I don't think this would be an ideal case because... It's always hard to find ideal cases. But tell us why it wouldn't be ideal. Because the trial court's determination is adequate here. Well, maybe it is the type of case where the... If the trial court's adequate, then we should just defer to it. That would be the argument. If that was the court's position. If the court were going to reconsider en banc, it would defer to the wonderful job the trial court had done in examining the entire record rather than us reviewing the entire record ourselves. That's correct. You have to be a little careful about what you wish for here. Because the government occasionally sits over there as opposed to over there in the CIT cases. And if you're sitting over there, you might want a more thoroughgoing type of review. Yes, Your Honor. So you're not necessarily always batting from the same side of the plate. I'm certainly not advocating at this point a change in the standard of review. I don't want to... We're catching you off guard on this. And I understand that. It's not really fair. But to be fair... It may be good for the government to know that this issue is still at least in play. I will certainly make a note at a higher level, Your Honor. Well, you may not have to. However, in this case, Chenery should not be an issue. What's at issue here is Commerce's K-1 decision. Under K-1, Commerce makes a determination of whether the product unambiguously falls within the scope or unambiguously falls without the scope. In this case, Commerce said we cannot make a determination that unambiguously falls one way or the other. So it went to K-2, the results of which were that it fell outside the scope of the anti-dumping duty order. What's K-2, diversified product? That's correct, Your Honor. The appellants have not challenged the K-2 analysis here. They're only challenging Commerce's determination that Etufei does not unambiguously fall within the scope of this order. And Commerce, unlike these customs cases which are examined in which the court must look to Congress's intent, this court has repeatedly held, most recently I believe in DeFerco, that when the court is examining a Commerce determination on scope, it is Commerce that must examine the scope of the order and must make a determination of whether the product falls within it. Unlike a customs classification case where Congress has written the harmonized tariff schedule and Congress's intent is actually at issue. Here there's no question. It's when Commerce issued this anti-dumping duty order, its intent is at issue, and Commerce should have looked, which it did, to the ITC proceedings and any other proceedings relating to this order. For these reasons, we respectfully request that you affirm the decision of the court below. Do you think all of the – your opposing counsel has cited a number of cases involving different types of mostly food products, maybe exclusively food products, that have been modified in various ways. Do you think all of those cases are entirely consistent with the outcome in this case? Yes, for the reasons explained in my brief, and I'd be happy to go through them. Well, let me – I don't want you to go through all of them, but the one that caught my attention, there are two of them actually, the garlic case and the tomato – it sounded like tomato paste or tomato sauce case. Yes, sir. Taking the tomato case, you wouldn't argue that it would be correct, I take it, to say that ketchup is the same thing as tomatoes. Certainly not. And tomato sauce, the kind of stuff that you pour over spaghetti, if it's meatless tomato sauce, would that be tomatoes? I – it – we – I guess your answer is Commerce could make up their mind and then we'd – No, no, if the anti-dumping duty order said – Tomatoes. Tomato sauce most likely should not fall within the order. Again, it depends upon – Well, then why is – these poor tomatoes in Orlando food, according to your description, had been pulverized, cooked, and spiced. That sounds like, at worst, tomato paste. First, Orlando foods involved a custom classification case, again, which must look at our – But you're not arguing that that standard isn't equally applicable here, right? In other words, if it's a different product for purposes of classification, you wouldn't contend that it's not a different product for purposes of anti-dumping. Well, Commerce specifically said in this order that the harmonized tariff schedule is not dispositive. Well, not dispositive, but in a case in which – if this case involved the exact product that was in all of the Orlando food, you wouldn't say, well, we decide this differently from the way we decided under the HTSUF? Based upon what I have in front of me? No, Your Honor. I understood your argument to be that Orlando food was distinguishable from this case, not that it may be the same as this case, but we would use a different standard. Well, in Orlando food, the question was, were the tomatoes prepared, not were they substantially transformed. We concede, and we agree, Commerce agreed, that the crawfish tail meat that is present in the HTSUF has been prepared. There's no other way it could get into the HTSUF unless it was prepared. The product has been changed. It's a new product containing prepared crawfish tail meat. The question is, is HTSUF crawfish tail meat? This goes back to what Your Honors were asking at before. Is bread wheat? Well, but then the question as applied to Orlando food is, is tomato sauce tomatoes? But it wasn't tomato sauce. It was a tomato puree, I believe. Well, puree and sauce, I'm not a cook either, and to me those are indistinguishable. The way I read the case in that case was the end use of the tomato puree was the same as the tomatoes at issue. Ultimately, you could use the tomatoes to create a sauce, or you could use the puree to create a tomato sauce. Whereas in this case, you could use crawfish tail meat to make a further product. However, HTSUF is HTSUF. The only thing you can do with it is eat it, place it on rice, or something similar to that. It's not interchangeable with the use of crawfish tail meat, as would the tomatoes be. For these reasons, we respectfully ask that you sign the decision of your portfolio. Thank you, Your Honors. Thank you, Mr. Silverbrand. Mr. Steinberger has a few minutes left. Thank you. Mr. Silverbrand said that the first step in Congress' analysis is to decide whether the language of the scope description unambiguously resolves the issue, and he cited for that proposition 351-225-K, one of the regulations, which does not say unambiguously. The question under that section of the regulation is, does it resolve the question? And the next step from there is you look at the language. If you cannot resolve the question without doing violence to the essential plain meaning of the terms in scope language, you have a problem, if you're Congress. Secondly, on the question of HTS classifications, I want to be clear that we have never argued that because a classification fell a certain way at the CIT or at Customs, the same procedure should apply here. Those classification decisions are irrelevant in our view because in each one of them, the Court was not interpreting the intent of Congress. They were interpreting what the ordinary commercial meaning of preserved and prepared is. Do you have any thoughts on what this Court's standard of review ought to be in this case? Well, it's a bit of a curveball. I didn't expect to be asked for that. The standard of review based on current law should be that you look at it as the CIT. Absolutely. I'm asking about what it should be if this Court were to reconsider it en banc. I suppose I would have to say that you should not change what you've done. You should be looking at the issues the same as you would have before, the same as the CIT looked at the issues, rather than to defer to the CIT. Does the CIT deserve any deference? I would say not, and especially in this case. Yeah, not in this case, as far as we're concerned. I don't think I have anything else to add that could be done in one minute and 32 seconds. I would love to talk about Wakanaga and Orlando Foods, but I think we've done that in our brief. Is Wakanaga the garlic case? Wakanaga is garlic. All right, you've described this case as quite sufficiently brief. I would simply, unless you have any further questions, implore you to take a close look at the cases, and I know that you will. Thank you, Mr. Steinberg. This case will be taken under review.